KSC/7.12.19

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2019 AUG 23 PM 12:05
CLERK'S OFFICE
AT BALTIMORE
BY _____
DEPUTY

**U.S. Department of Justice**
*United States Attorney*
*Organized Crime Drug Enforcement Task Force*

Michael C. Hanlon
Assistant United States Attorney
Michael.Hanlon@usdoj.gov
Regional Director

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4895
MAIN: 410-209-4800
FAX: 410-962-9293

July 12, 2019

Laura Abelson, Esquire
Assistant Federal Public Defender

Re: United States v. Aimee Jones
Criminal No. GLR-19-0373

Dear Ms. Abelson:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Aimee Jones (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by July 25, 2019, it will be deemed withdrawn. The terms of the Agreement are as follows:

## Offense(s) of Conviction

1. The Defendant agrees to waive indictment and plead guilty to a two-count criminal Information, which will charge the Defendant with Conspiracy to Distribute Narcotics, in violation of 21 U.S.C. § 846; and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 371. The Defendant admits that the Defendant is, in fact, guilty of the offenses and will so advise the Court.

## Elements of the Offense(s)

2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Information, in the District of Maryland:

### Count One

i. Two or more persons entered the unlawful agreement charged in the Information to distribute 100 grams or more of a substance containing a detectable amount of heroin, a Schedule I Controlled Substance; and

1

ii.  The Defendant knowingly and willfully became a member of that conspiracy.

Count Two

i.  There existed an agreement between two or more persons to commit one or more substantive money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or § 1957;

ii.  The Defendant knew that the money laundering proceeds had been derived from an illegal activity;

iii.  The Defendant knowingly and voluntarily became part of the conspiracy; and

iv.  A member of the conspiracy committed an overt act in furtherance of the conspiracy.

Penalties

3.  The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 21 U.S.C. § 846 | 5 years | 40 years | At least 4 years | $5,000,000 | $100 |
| 2 | 18 U.S.C. § 371 | None | 5 years | 1 year | $250,000 | $100 |

a.  Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.  Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.  Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.  Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

        e.        Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

        f.        Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4.        The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

        a.        If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

        b.        If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

        c.        If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

        d.        The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If

the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

        e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

    a. This Office and the Defendant further agree that the applicable base offense level is calculated pursuant to United States Sentencing Guidelines ("U.S.S.G.") as follows:

        Base offense level: 28, because the offense involved at least 700 grams of heroin as well as a quantity of fentanyl (U.S.S.G. § 2D1.1(c))

    b. The Defendant reserves the right to seek the following guidelines adjustments:

        i. Whether the defendant should receive a mitigating role reduction per U.S.S.G. § 3B1.2; and

        ii. Whether the Defendant is eligible for a safety valve adjustment per 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.

    c. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

15. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

16. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

17. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not

required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

18. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

*/s/ Michael C. Hanlon*

Michael C. Hanlon
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

7/24/19
Date

*/s/ Aimee Jones*
Aimee Jones

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

7/24/19
Date

_Laura Abelson_
Laura Abelson, Esquire

9

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

From at least 2017 through February 2019, the defendant Aimee Jones conspired with other persons to distribute heroin and other narcotics in the District of Maryland and elsewhere.

During the investigation, Federal Bureau of Investigation and Maryland state investigators worked with a confidential informant (the CI) who knew Aimee Jones. The CI engaged in numerous phone calls, on a regular basis, with Jones during which the two would discuss possible drug deals or would plan future drug deals. Investigators recorded and/or monitored many of those phone calls. Examples of conversations during those calls included the following:

On May 31, 2018, Aimee Jones told the CI during a call that Jones could provide the CI "as much as you want." Jones also said "whatever you want I can get it go, I have it…"

On September 17, 2018, Aimee Jones engaged in a phone call with the CI during which the CI inquired about the price for a half a kilogram. Aimee Jones said to the CI, "you said a half a key right," and ultimate told the CI that the price would be "50."

On various dates, law enforcement officers worked with the confidential informant and made controlled purchases of narcotics from Aimee Jones. Specifically, the CI purchased the following quantities of narcotics (the type and quantity of the narcotics in each instance has been confirmed by lab analysis) from Aimee Jones, in Maryland, on the following dates: on May 18, 2019, 19.5 grams of a heroin/fentanyl mixture; on July 15, 2018, 49.18 grams of heroin; on November 19, 2018, 49.66 grams of heroin.

On September 10, 2018, Aimee Jones coordinated with the CI and with Aimee Jones's co-conspirators for the CI to buy drugs from the conspirators. The CI met with one of the co-conspirators and purchased approximately 50.02 grams of heroin. Following the transaction, members of the conspiracy contacted the CI because they felt the CI had not paid enough money. Ultimately, Aimee Jones also called the CI and advised the CI that the heroin purchased that day was more expensive than previous days because it was "different stuff" and "better than that other stuff."

Beginning in late 2018, investigators began to monitor Jones's communications on her cellular phones pursuant to federal court wiretap orders. During the wiretaps, Jones frequently engaged in phone calls in which she would seek to acquire quantities of narcotics from her co-conspirators, would receive instructions about the distribution of narcotics or the handling of money from her co-conspirators, or would plan or discuss drug transactions with customers.

Jones's co-conspirators would advise her of when drugs were expected to be available, and would arrange to meet with Jones, often in New York, to convey drugs to her.

Jones's coconspirators would instruct her about when to take drugs to customers, and the quantities she should take to customers. The calls often involved a member of the conspiracy saying that Jones should take a number of something (the item was often not specific) to a particular person. Jones would also be instructed to pick up money from customers of the conspiracy, and to send that money to her coconspirator suppliers.

During the wiretap, investigators also monitored calls between Jones and her customers. Aimee Jones and customers would discuss the times of drug deals, the quantities of heroin to be provided, the price of the heroin, and whether Aimee Jones had heroin available. On numerous occasions, Jones engaged in phone calls with persons who were customers of Jones's, and/or customers of the organization in general. Jones would discuss meeting times with the customers, and would agree to convey particular quantities of narcotics. Such calls often involved the use of coded terms, including references to numerical quantities without specification as to what the numbers were for; and references to "girl" or "boy," which were coded phrases referring to cocaine and heroin respectively.

Jones would travel to New York from time to time to discuss drug deals, or to acquire drugs from her suppliers in New York. On some of those trips, Jones would then bring the drugs back to Maryland for distribution.

On January 11, 2019 at approximately 1:38pm, Maryland State Police troopers, acting in cooperation with this investigation, conducted a vehicle stop of Aimee Jones's black Honda Accord. Aimee Jones was driving the vehicle and was in the car by herself. The vehicle was scanned by a police canine that alerted positive for the presence of narcotics. Upon search of the vehicle, investigators found a quantity of narcotics, suspected to be heroin, in Aimee Jones's purse on the front passenger seat. The suspected heroin was submitted for lab analysis and was determined to be 38.96 grams of a heroin/fentanyl mix, a Schedule I controlled substance. The defendant admits that she knowingly possessed the narcotics, and that she possessed the narcotics in furtherance of the conspiracy to distribute narcotics described herein.

On February 5, 2019, federal and Maryland state law enforcement investigators executed a search warrant at Aimee Jones's residence in Cumberland, Maryland. Jones was located in the residence at the time of the search. Officers searched the residence and found: suspected marijuana edibles, three bags of suspected marijuana, suspected heroin, one small bag containing a white substance, a plastic container containing fiber, a digital scale, a hydraulic press, packaging material, and a coffee grinder containing suspected narcotics residue.

The defendant agrees that the conspiracy involved the distribution of at least 700 grams of heroin, a schedule I controlled substance, and that it was reasonably foreseeable to the defendant that she or other members of the conspiracy would distribute at least 700 grams of heroin during the course of and within the scope of the conspiracy.

Money Laundering Conspiracy Evidence

The aforementioned federal and state investigation also revealed that the drug-trafficking organization in this case, of which Aimee Jones was a member, also engaged in a conspiracy to commit money-laundering in furtherance of the narcotics activity. Aimee Jones's agreements with her coconspirators included an agreement to transfer money to the suppliers in order to pay for drugs. Aimee Jones also agreed with those coconspirators to conduct financial transactions, including the payment of money to drug suppliers and other transactions, in order to promote the carrying on of their ongoing conspiracy to distribute narcotics. The money used during those transactions constituted the proceeds of narcotics trafficking, and Jones and her coconspirators knew that the money used during those transactions constituted the proceeds of narcotics trafficking. During the aforementioned wiretap, the defendant engaged in phone calls with other members of the conspiracy in which the conspirators discussed transmitting quantities of money through various means, including through Western Union and through cellular-based cash transmission applications, and other means.

The organization transmitted its narcotics profits between members of the organization through various means, including by wiring through services like Western Union. Specifically, defendant Aimee Jones sent transmissions of money to other members of the conspiracy through the following means on the following dates (among others): $1000 by Moneygram to a coconspirator on August 19, 2017; $6300 in Moneygram transmissions to a coconspirator from February 5-20, 2018; $500 to a coconspirator on May 19, 2018; and $1000 by Western Union on August 19, 2017.

SO STIPULATED: 7/24/19

_____
Michael C. Hanlon
Assistant United States Attorney

_____
Aimee Jones
Defendant

_____
Laura Abelson
Counsel for Defendant